# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Six cellular telephones, one iPod, | ) | Case No. 2:18-MJ-02707 |
| and one laptop in the secured | ) | |
| custody of Drug Enforcement | ) | |
| Administration in Los Angeles, | ) | |
| California | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A(2)*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See attached Affidavit* | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA SA Lindsay T. Burns
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, CA

Hon. Frederick F. Mumm, United Sates Magistrate Judge
*Printed name and title*

AUSA: Benjamin R. Barron

## ATTACHMENT A(2)

PREMISES TO BE SEARCHED

The premises to be searched are six cellular telephones, one iPod, and one laptop in the secured custody of Drug Enforcement Administration in Los Angeles, California, which are described further as follows: (1) a silver iPhone bearing IMSI number 354434065262407 ("**SUBJECT PHONE 3**"); (2) a silver iPhone X with a phone cover label "VANS OFF THE WALL" bearing no serial number ("**SUBJECT PHONE 4**"); (3) a black Kyocera phone bearing HEX number 99000612270565 ("**SUBJECT PHONE 5**"); (4) a rose gold iPhone bearing IMEI number 359477082274694 ("**SUBJECT PHONE 6**"); (5) a silver iPhone bearing IMEI number 359304068847014 ("**SUBJECT PHONE 7**"); (6) a silver iPhone bearing IMEI#: 355394072948571 ("**SUBJECT PHONE 8**"); (7) a silver iPod bearing serial number CCQFX7KRDCP9 ("**SUBJECT DEVICE 1**"); and (8) a silver MacBook Pro with a red sticker and white lettering displaying "Supreme" on one side and the other side displaying a pink/blue sticker ("**SUBJECT DEVICE 2**").

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of a controlled substance, including distribution causing death, and related conspiracy), namely:

a.    Data, records, documents, programs, applications, photographs, recordings, or other materials relating to the possession, acquisition, or trafficking of controlled substances, such as: ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, or other records noting price, quantities, and/or times when controlled substances were bought, sold, or otherwise distributed.

b.    Any data, records, or other materials related to the acquisition or filling of prescription controlled drugs, such as: prescriptions (blank or completed), pharmacy or medical records, or communications related to receiving, filling, or selling any prescription or prescription drug.

c.    Data, records, documents, programs, applications or materials relating to: (1) Romelo Rice, such as communications with or about him; (2) communications with the witnesses discussed in the underlying affidavit; or (3) any drug overdose or drug overdose death.

d.    Data, records, documents, programs, applications, photographs, recordings, or other materials relating to the

collection, transfer or laundering of the proceeds of controlled drug trafficking.

e. Global Positioning System ("GPS") coordinates, calendar entries, or other locational information or records documenting location, travel routes, destinations, or origination points.

f. Any data, records, documents, programs, applications, photographs, recordings, or other materials that otherwise relate to the dates March 17, 18, and 19, 2018, such as: calendar entries, communications and communication logs on such dates or relating to events that occurred on such dates, or recordings created on such dates or relating to events that occurred on such dates.

g. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

h. With respect to any of the **SUBJECT DEVICES** containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as

iii

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v.  evidence of the times the device was used;

    vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    viii. records of or information about Internet Protocol addresses used by the device;

    ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

### SEARCH PROCEDURE FOR DIGITAL DEVICES

  2.  In searching the **SUBJECT DEVICES** or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

    a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may

iv

search any digital device capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each digital device where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the digital devices as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the digital device and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the digital device and delete or destroy all forensic copies thereof.

g.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside

the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

        i.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        j.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

      3.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Lindsay T. Burns, being duly sworn, declare and state as follows:

### I.   <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") and am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and make arrests for the narcotics offenses enumerated in Title 18, United States Code, Section 2516.

2.   I have been employed as a DEA Special Agent since June 2010.  I received five months of training at the Department of Justice Training Center, and I have participated in dozens of narcotics investigations as the case agent or as an investigating agent.  I have debriefed defendants and witnesses who had personal knowledge regarding narcotics trafficking organizations.  Additionally, I have participated in many aspects of narcotics investigations, including conducting wiretap investigations, physical surveillance, search warrants, and arrests.

3.   Unless otherwise noted, when I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Likewise, information resulting from surveillance, except where otherwise indicated,

1

does not necessarily set forth my own observations, but rather has been provided directly or indirectly by DEA Special Agents or other law enforcement officers who conducted such surveillance.

## II. PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of an application for a warrant to search the following locations (collectively, the "**SUBJECT DEVICES**"), for evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of a controlled substance, including distribution causing death, and related conspiracy):

a.   Two cellular telephones in the secured custody of Los Angeles Police Department Valley Property Division, in Van Nuys, California, sealed in plastic evidence baggies bearing the exhibit numbers 38 and 39, respectively, and which are described further as follows: (1) a black iPhone, bearing no visible serial number (exhibit 38) ("**SUBJECT PHONE 1**"); and (2) a black LG cellular telephone, bearing no visible serial number, and bearing a circular Trac logo (exhibit 39) ("**SUBJECT PHONE 2**");

b.   Six cellular telephones, one iPod, and one laptop in the secured custody of DEA, in Los Angeles, California, which are described further as follows: (1) a silver iPhone bearing IMSI number 354434065262407 ("**SUBJECT PHONE 3**"); (2) a silver iPhone X with a phone cover label "VANS OFF THE WALL" bearing no serial number ("**SUBJECT PHONE 4**"); (3) a black Kyocera phone bearing HEX number 99000612270565 ("**SUBJECT PHONE 5**"); (4) a rose gold iPhone bearing IMEI number 359477082274694 ("**SUBJECT**

2

**PHONE 6**"); (5) a silver iPhone bearing IMEI number 359304068847014 ("**SUBJECT PHONE 7**"); (6) a silver iPhone bearing IMEI#: 355394072948571 ("**SUBJECT PHONE 8**"); (7) a silver iPod bearing serial number CCQFX7KRDCP9 ("**SUBJECT DEVICE 1**"); and (8) a silver MacBook Pro with a red sticker and white lettering displaying "Supreme" on one side and the other side displaying a pink/blue sticker ("**SUBJECT DEVICE 2**").

5.    The **SUBJECT DEVICES** are further described in Attachments A(1) and A(2) hereto, which are incorporated as though fully set forth herein.  The items to be seized are set forth in Attachment B hereto, which is also incorporated as though fully set forth herein.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

7.    I am conducting an investigation jointly with the Valley Homicide unit of the Los Angeles Police Department ("LAPD") into the fentanyl overdose death of victim Romelo Rice on or about March 18, 2018.  Based on evidence set forth herein, I submit that there is probable cause that drug trafficker James

3

Dorion RODRIGUEZ ("RODRIGUEZ") delivered the powerful narcotic fentanyl to Rice in the early morning hours of that date, which soon thereafter caused Rice to suffer a fatal overdose after he consumed the drugs.

      a.   On September 28, 2018, a federal grand jury returned an indictment charging RODRIGUEZ with a violation distributing fentanyl to Rice resulting in his death, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).

      b.   On October 4, 2018, RODRIGUEZ was arrested on the indictment, following which he waived his Miranda rights and submitted to a recorded interview in which he admitted to selling controlled drugs to Rice on the night of his death.

   8.   At the time that RODRIGUEZ engage in the above transaction, he had recently been convicted of felony drug trafficking.  Specifically, in February 2018, RODRIGUEZ was convicted for a felony violation of California Health and Safety Code Section 11351 (possession of cocaine for sale).  RODRIGUEZ is currently on formal probation until February 4, 2021, the terms of which include a warrantless search condition. Regarding the warrantless search condition, certified minutes for the underlying conviction reflects that the Court imposed a condition that RODRIGUEZ "submit your persona and property to search and seizure at any time of the day or night, by any probation officer or other peace officer, with or without a warrant, probable cause, or reasonable suspicion." (Accordingly, the instant search warrants may not be required

under the Fourth Amendment.)  A police report from the
underlying arrest reflects that this conviction stemmed from an
April 2017 traffic stop, during which RODRIGUEZ was found in
possession of cocaine base, controlled narcotic pills
(hydrocodone, codeine, and methadone), alprazolam (a Schedule IV
benzodiazepine commonly known as Xanax), marijuana, a digital
scale, 57 small plastic baggies, and $3,800 cash in various
denominations.  RODRIGUEZ's criminal rap sheet also includes a
2014 conviction for violating California Health and Safety Code
Section 11350(a) (possession of a controlled substance), which
was reduced to a misdemeanor following his completion of a
diversionary program.

9.   On March 18, 2018 at approximately 9:50 a.m., LAPD Van
Nuys patrol unit 9A19 responded to an ambulance death
investigation at 14708 Ventura Boulevard in Sherman Oaks,
California.  Upon arrival, officers met with paramedics from the
Los Angeles Fire Department.  They reported that, on arrival
shortly beforehand in response to an emergency call, they
discovered the deceased male (later identified as 23-year old
Romelo Rice) in the driver's seat of a black Toyota Corolla.
Time of death was pronounced at 9:45 a.m.  The vehicle had run
over a metal sign and parking barrier and came to rest against
another parked vehicle.

a.   Officers canvassed the area and located several
witnesses who had observed the vehicle in the parking lot as
early as approximately 3:00 a.m.  Additionally, while officers
were on scene, B.A. called Rice's cellular telephone.  After

5

officers answered the call, B.A. told them that Rice had been driving his (B.A.'s) car. (B.A.'s wallet was also found in the driver's side door pocket of the car, together with two plastic baggies the contents of which later tested positive for cocaine.)

b.    LAPD Homicide Detectives Moakley and January responded to the location for further investigation, and Los Angeles County Coroner Investigator Branson also responded to the scene. Rice's body was removed from the vehicle. Branson examined the body and found no obvious signs of trauma or foul play. Rice's body and clothing were searched, during which a baggie containing a white powdery substance was recovered from Rice's pants pocket. The powdery substance later tested positive for fentanyl.

c.    The body was transported to the Coroner's office for further investigation. Los Angeles County Medical Examiner Dr. Carrillo conducted a post-mortem examination of Rice. Toxicology results revealed that Rice had died of an accidental overdose caused by the combined effects of fentanyl and cocaine; the level of cocaine was toxic, while the level of fentanyl was fatal and was determined to have caused Rice's death.

10.  The investigating detectives were contacted by Rice's father. He reported that he had spoken to several of Rice's friends who told him that Rice had purchased drugs from a dealer named "Dorion" (i.e., RODRIGUEZ, whose middle name is Dorion per California DMV records) prior to Rice's death, and that "Dorion"

had made statements indicating that he may have given Rice the
wrong drugs during the transaction.

11.   On March 23, 2018, Detectives Santana and Martinez
interviewed Rice's sister, N.B., from which they learned among
other things the following.  N.B.'s friends told her that
"Dorion" (i.e., RODRIGUEZ) had given Rice drugs (cocaine) the
night before he died; N.B. knows Dorion through mutual friends
and through Rice.  Dorion told N.B.'s friends that he hoped he
didn't give Rice the wrong drugs, because he sells heroin and
cocaine.  N.B. also spoke to Dorion on the phone about the
events leading up to Rice's death.  From her conversations with
Dorion's mutual friend and with Dorion personally, she learned
that Dorion agreed to meet with Rice at the restaurant Crave
Cafe, located on Ventura Boulevard in Sherman Oaks
(approximately .3 miles from where Rice was later found
deceased).  Once they met, Dorion waited for his "connect" for
more cocaine.  The connect did not arrive, so Dorion "fronted"
Rice some drugs.  Rice invited Dorion to hang out with Rice at a
music studio, but Dorion declined.  Shortly after, Rice called
Dorion but Dorion claimed that he did not answer.  Dorion said
he gave Rice the same drugs he (Dorion) was using all day/week.

12.   On March 26, 2018 at approximately 12:45 p.m.,
Detectives Marsh and Santana interviewed B.A. at LAPD's Van Nuys
Station, from which the detectives learned among other things
the following.

a.   B.A. and Rice were best friends.  The day prior
to Rice's death, Rice and B.A. met up around 3:00 p.m.  Around

10:00 p.m., they decided to go to a music studio in West Hollywood, California.  They recorded music for a couple hours and smoked marijuana; they also had been doing cocaine together. Rice was texting on his phone but B.A. did not know with whom he was communicating.  At around midnight or 1:00 a.m., Rice asked B.A. to use his car.  B.A. agreed and assumed that Rice wanted to use it to go visit a girl that Rice had met during a trip to New York, who was visiting Los Angeles.  Rice did not directly tell B.A. where he was going or why he needed the car.  Rice grabbed the keys and left.

      b.   (Investigators later interviewed the female referenced by B.A., initials J.A.  She verified that she was visiting from New York around the time of Rice's death, and that she had written Rice to let him know that she was in town and to ask about meeting up.  However, she did not receive a response and they never met up.)

      c.   B.A. fell asleep and woke up around 4:00 or 5:00 a.m.  B.A. realized that Rice had not returned with the car. B.A. began to call Rice repeatedly but there was no answer.  At approximately 7:00 or 8:00 a.m., a police officer answered Rice's phone but did not tell him that Rice was deceased.

      d.   Approximately one hour after B.A. spoke to officers, he called Dorion (RODRIGUEZ) via Snapchat.  Dorion told B.A. that he had met up with Rice at Crave Cafe (possibly in Sherman Oaks) that night and "fronted him a bag."  Ten to twenty minutes later, Rice texted him (Dorion) stating "I think you gave me the wrong stuff.  I'm sweating."  Dorion asked Rice

to send him a picture of the bag.  Dorion started calling Rice but there was no answer.  Dorion told B.A. "I hope I didn't give him the wrong stuff."  B.A. began to panic.  B.A. thought that Dorion might have given Rice heroin by mistake.  He was later informed by N.B. that Rice had been found dead.

e.   B.A. met Dorion (RODRIGUEZ) at North Hollywood High School.  Dorion is a drug dealer who sells cocaine.  B.A. has seen Dorion with other drugs (codeine and "China" heroin) but he is unsure if he sells them.  Rice had been buying cocaine from Dorion since early 2017.  He usually bought once every two to three weeks.  The cocaine is usually packaged in a small clear baggie with a seal.  It was normal for Rice to use the cocaine immediately after purchasing it.  Rice usually broke it down into "bumps or lines" and snorted it with a dollar bill. B.A. has also bought cocaine from Dorion in the past.  Detective Marsh showed B.A. a California Department of Motor Vehicles ("DMV") photograph of RODRIGUEZ, whom B.A. verified was "Dorion."

13.   Investigators have obtained surveillance footage from both the interior and exterior of the Crave Café in Sherman Oaks, which investigators observed shows, among other things, the following:

a.   The surveillance footage shows that, at around 12:30 a.m., RODRIGUEZ arrived at the location in what investigators recognize as a 2007 Honda Accord registered to RODRIGUEZ (the "SUBJECT VEHICLE").  After arriving, RODRIGUEZ met with two other persons, one of whom is believed to be a

person with initials R.R.  Interior footage shows that, around 1:00 a.m., RODRIGUEZ went inside the restaurant to make a credit card purchase.  (LAPD detectives later obtained a receipt for the transaction, which identifies RODRIGUEZ by name as the customer.)

b.   At around 1:09 a.m., Rice arrived, alone, in the car in which he was later found deceased.  Rice then met with RODRIGUEZ and R.R., after which Rice and RODRIGUEZ walked out of the camera's view; R.R. then went to Rice's car apparently to retrieve an unidentified item from it, after which he followed Rice and RODRIGUEZ off camera.

c.   At 1:41 a.m., Rice then drove away, again alone, in the same car, heading eastward from the restaurant.

d.   At around 3:57 a.m., a dark van pulled into the Crave Café parking lot, with two unidentified male occupants. They interacted with RODRIGUEZ for approximately 30 minutes, while the driver spent time inside the rear passenger area of the van.  Investigators believe these two persons to be RODRIGUEZ's supplier, i.e., the "connect" for whom RODRIGUEZ was waiting noted in the above witness statements.  The video shows RODRIGUEZ meeting with one of the unidentified males at the passenger side door of the van, and it then shows them engaging in an apparent hand-to-hand transaction.  RODRIGUEZ then entered the driver's side door of the SUBJECT VEHICLE and appeared to be examining or weighing the item.

e.   At 4:35 a.m., the van left the restaurant, and a minute later RODRIGUEZ separately left in the SUBJECT VEHICLE.

14.   Investigators have also obtained, pursuant to a search warrant, historical cell site data for Rice's cellphone.

a.   The records verify that, between around 11:00 p.m. and 12:45 a.m., Rice's phone was pinging off cell towers in the West Hollywood area.  Notably, those calls were made to RODRIGUEZ at (818) 564-0967 ("the 0967 phone number"), a phone number that investigators know is used by him.

b.   Rice's next call, at 1:09 a.m., pinged off of a cell tower in Sherman Oaks located less than a block from Crave Café; this call was also made to the 0967 phone number.  As noted, this time correlates with when surveillance footage shows Rice arriving at Crave Café.  Accordingly, investigators believe that, in this call, Rice was letting RODRIGUEZ know that Rice had arrived at the restaurant.

c.   Rice's next two calls were made at 1:51 a.m. and 1:55 a.m., a few minutes after surveillance footage showed Rice leaving the restaurant.  Both calls were to RODRIGUEZ and lasted, respectively, 69 seconds and 37 seconds.  Investigators believe these to be the above-referenced calls made by Rice to RODRIGUEZ demanding to know what drugs RODRIGUEZ had given him, made after Rice began feeling the effects of the fentanyl.  Rice's final outgoing call, at 2:00 a.m., was to B.A.; the call lasted seven seconds and thus appears to have gone unanswered.  All three calls pinged off the same cell tower in Studio City, California; investigators thus believe that Rice had begun heading back eastward from Crave Café to West Hollywood, which I submit is likewise consistent with the witness statement above

11

that, after the drug deal, Rice had asked RODRIGUEZ to come to
the studio.  Because all three calls pinged off the same cell
tower, I believe that Rice pulled over in Studio City a few
minutes after leaving Crave, when he began feeling the overdose.

d.   Notably, the next calls to Rice were all made by
RODRIGUEZ via the 0967 phone number, namely, calls at 2:20,
2:21, 2:22, 2:29, and 3:01 a.m., all of which went unanswered.
Investigators believe that this series of calls reflects
RODRIGUEZ's repeated (and apparently panicked) efforts to
contact Rice after RODRIGUEZ realized that he had given Rice
fentanyl instead of cocaine.  Those calls all pinged off the
same cell tower in Sherman Oaks located near Crave Café and, as
noted, blocks away from the parking lot in which Rice was found
dead.  Investigators thus believe that the call records reflect
that, sometime between 2:00 a.m. and 2:20 a.m., feeling the
effects of the overdose, Rice turned around and began to head
back from Studio City toward Sherman Oaks, and that he pulled
into the parking lot, where he passed out from the overdose and
ultimately died.

e.   (Investigators have custody of Rice's iPhone,
which was provided by his family together with consent to
search, but to date forensic examiners have not been able to
bypass security features on the iPhone to conduct the search.)

15.  Investigators also have determined that RODRIGUEZ has
engaged in conduct that I submit reflects consciousness of
guilt.  For example, California DMV records show that RODRIGUEZ
obtained a new license plate for the SUBJECT VEHICLE on March

12

27, 2018, soon after Rice died, purportedly for damaged license plates.  Multiple witnesses have also verified that RODRIGUEZ did not come to Rice's funeral even though the two were longtime friends.  From surveillances, investigators also believe that RODRIGUEZ moved out of his residence following Rice's death, and investigators have been attempting to confirm RODRIGUEZ's current place of residence since then.  Additionally, on May 31, 2018, investigators conducting surveillance observed RODRIGUEZ engaging in what they recognized to be counter-surveillance driving in an effort to thwart law enforcement surveillance.  Specifically, at around 3:30 p.m., they saw RODRIGUEZ and an unidentified male at a grocery store in Van Nuys, seated in the SUBJECT VEHICLE.  Ten minutes later, they saw a Kia SUV with two unidentified male occupants enter the parking lot.  One of the Kia's occupants met with RODRIGUEZ and then got into the rear seat of the SUBJECT VEHICLE.  RODRIGUEZ entered the driver's seat of the SUBJECT VEHICLE and began driving around the lot while the Kia followed.  When they finally stopped and parked again, the passenger in the Kia met with RODRIGUEZ, after which they parted ways.  Based on these observations, investigators believe that RODRIGUEZ and the Kia were engaged in a drug transaction, and that the cars circled around the parking lot in an effort to detect any surveillance before stopping to conduct the transaction.

16.  Investigators also secured a search warrant for the Snapchat (social media) account controlled by RODRIGUEZ, including for electronic communications.

a.   The responsive records include a series of
communications sent to N.B. on March 22, 2018 (four days after
Rice's death), asking her to "please don't be upset with me
right now that [is] the last thing I want/need" and stating that
"I'm not hiding anything or not telling you anything about my
last encounter with Ro [Rice].  I just wish I could go back to
that day and ride with him too [sic] the studio like he asked
and wanted or at least follow."

b.   The records also include other communications
that I believe refer to drug trafficking.  For example, on March
15, 2018, RODRIGUEZ received a message offering to sell "240
Roxy 30s" and providing a contact number; I recognize this
message as referring to 240 pills of 30-mg oxycodone (commonly
referred to by the brand name Roxicodone, or "Roxys").  The
Snapchat records do not include a response message from
RODRIGUEZ.  Similarly, there are other messages that I recognize
as referring to "china white," slang for heroin, often mixed
with the synthetic narcotic fentanyl: a March 10, 2018 message
to RODRIGUEZ asking "how much the chi hit for" (which I believe
is asking for pricing of china white), and a May 1, 2018 message
from RODRIGUEZ stating "Only China" (which I believe references
that all RODRIGUEZ was offering to the prospective customer was
china white).

17.  During the course of the investigation following
Rice's death, LAPD homicide detectives have secured search
warrants authorizing the placement of a GPS tracking device on
the SUBJECT VEHICLE, and GPS tracking of two cellular telephone

14

numbers that investigators identified as being used by
RODRIGUEZ: (1) the 0967 phone number, and (2) (818) 301-8039
("the 8039 phone number").[1]  Investigators also have used the
tracking data to conduct surveillance of RODRIGUEZ, during which
they have observed RODRIGUEZ in the SUBJECT VEHICLE on multiple
occasions (often as a passenger), and they have also observed
multiple instances when the SUBJECT VEHICLE and the two phones
were located in approximately the same place.  Notably, on or
about August 23, 2018, investigators conducting surveillance
observed RODRIGUEZ discard foil from the SUBJECT VEHICLE into
the street, which investigators retrieved and observed bore
apparent drug residue.  Forensic testing confirmed that the
residue on the foil is fentanyl.

     18.  On or about September 10, 2018, the GPS tracker on the
SUBJECT VEHICLE placed the car at an EZ Storage facility at
15330 Hatteras Street in Van Nuys.  DEA task force officers
later served a subpoena on the business and received responsive
records on or about September 13, 2018, which showed among other
things the following.  Unit 1015 ("the SUBJECT STORAGE UNIT")
was rented to RODRIGUEZ on July 23, 2018.  The rental
application shows RODRIGUEZ's full name and identifies his

---

[1] Investigators know that those phone numbers are used by
RODRIGUEZ based on a variety of evidence.  For example, the
Snapchat records discussed above for RODRIGUEZ's account include
multiple communications in which RODRIGUEZ provides one or the
other phone number to third parties.  Similarly, N.B. and B.A.
have identified one or both of the phone numbers as belonging to
RODRIGUEZ.  Both phone numbers are subscribed to the alias
"Choey Cho," and investigators know that RODRIGUEZ has a social
media (Instagram) account with the similar user name
"Choey_Horchata."  Finally, as noted below, the rental agreement
for the SUBJECT STORAGE UNIT includes both phone numbers.

contact number as the 8039 phone number.  The application also
lists an alternative contact as "Tracy T," which investigators
believe to be a false name, and provides the 0967 phone number
as that person's contact number.  On September 26, 2018, an
investigator spoke with the manager of the business, who
verified that rent for the SUBJECT STORAGE UNIT was later fully
paid by RODRIGUEZ and that it remains rented to him and
alternate "Tracy T" through October 22, 2018.

    19.  On September 22, 2018, an LAPD patrol unit impounded
the SUBJECT VEHICLE following a traffic stop, which was not
conducted as part of this investigation.  From reviewing an LAPD
report of the incident, and from speaking with one of the
officers who conducted the impound, I learned the following:

    a.  At around 8:45 p.m., two LAPD officers in a
marked patrol unit passed an Arco gas station in Van Nuys, where
they observed three males arguing with a gas station employee;
one male is unidentified (the "UM"), one was later identified as
B.G., and the third is believed to be RODRIGUEZ based on the
description provided that he had blond hair.  (During
surveillances, investigators have seen B.G. driving or sleeping
in the SUBJECT VEHICLE.)  GPS records for one of RODRIGUEZ's
phones, the 0967 phone number, shows that it was approximately
88 meters from the Arco station as of 8:39 p.m. and 8:54 p.m.
that night.  The officers resumed patrol and around ten minutes
later returned to the gas station.  On returning, they saw the
SUBJECT VEHICLE parked in front of a gas pump; they saw the UM
walk away from the front passenger area after which B.G., alone,

drove the SUBJECT VEHICLE away from the gas station.  The officers saw that the SUBJECT VEHICLE had a broken tail light and they thus conducted a traffic stop.  On approaching the car, they saw drug paraphernalia in plain view on the front passenger floorboard, namely, straws with burned tips and a blow torch.

   b.   The officers asked B.G. to step out of the car and learned that B.G. did not have a valid driver's license. Additionally, B.G. told the officers that the car's registration and proof of insurance would be in the glove compartment; when an officer went to retrieve them, he could not locate any proof of insurance.  B.G. told the officers that the car belonged to his brother "James" (i.e., James RODRIGUEZ).  (Investigators are not aware of any family relationship between B.G. and RODRIGUEZ.)  B.G. stated that he was going to pick up "James" (RODRIGUEZ) down the street.  The officers told B.G. that they saw the straw with the burned tip and asked if there was other contraband in the car; B.G. replied that there may be a pipe in the car that belonged to his brother (RODRIGUEZ) and a friend.

   c.   The officers cited B.G. for driving without a license and without insurance, in violation of California Vehicle Code Sections 12500(a) and 16028(a), and the SUBJECT VEHICLE was thus impounded pursuant to California Vehicle Code Section 22651(p).  The officers conducted an inventory search of the car and found, among other things: additional straws with burnt ends in the front passenger seat; clothing and a purse belonging to a female in the rear passenger area; and, in the trunk of the car, paperwork in RODRIGUEZ's name, a digital

17

scale, a plastic baggie containing multiple other plastic baggies, a locked container, and a black bag containing a purple powder.  When officers asked B.G. what the baggies are for, he responded, "He likes to spread out his shit."  B.G. also said that he did not know how to open the locked container, and he did not respond when officers asked him about the powder.

        d.   At around 9:50 p.m., after the inventory search was conducted, the UM arrived at the scene.  He identified himself as B.G.'s friend, stated that he arrived from a nearby fast food restaurant, and helped B.G. carry his personal belongings away from the car prior to towing.  Other than what B.G. retrieved, the officers left the remaining items in the SUBJECT VEHICLE, including the above-noted lockbox and powder.

    20.  The following morning, September 23, investigators in this matter learned of above incident, and they also learned that a person had called the tow yard to retrieve the SUBJECT VEHICLE.  An investigator went to the tow yard and saw, in plain view on the front passenger seat of the SUBJECT VEHICLE, a plastic baggie containing two pills, which he retrieved; the pills bear the wholesale markings of hydromorphone, a powerful Schedule II prescription narcotic commonly sold under the brand name Dilaudid.  Based on that observation, the impounding officers' observations, that the impounding officers left the powdery substance and lockbox in the trunk of the car, and based on the evidence herein that RODRIGUEZ deals in fentanyl (an extremely lethal synthetic opioid that can be absorbed through the skin or via inhalation), investigators called in a hazardous

material team to execute a further search of the vehicle, during which multiple suspected controlled substances were seized.[2]

    a.   On September 23, 2018, the specialized unit searched the vehicle, during which they found, among other things, multiple plastic bags containing a powdery substance, a digital scale, multiple spiral notebooks bearing apparent pay/owe drug ledgers, and **SUBJECT PHONES 1 AND 2**.  Later presumptive testing of the powdery substance showed that it contained lactose, which investigators know to be a common cutting agent for fentanyl.  Additionally, forensic analysis of the seized powders showed that one of them, with net weight 4.90 grams contained heroin and fentanyl, among other substances such as the controlled narcotic tramadol; another powder, with net weight 2.16 grams, likewise contained fentanyl and tramadol. (Three other powders came back as non-controlled, including the large batch of powder in the lockbox, which I believe means that they are cutting agents.)  Notably, the search team also found the rental agreement for the SUBJECT STORAGE UNIT in the glove compartment of the car, which was in RODRIGUEZ's name.

    b.   Regarding **SUBJECT PHONES 1 AND 2,** one of the phones seized from the car, an iPhone in a black case with no serial number, was found in the front passenger area. Investigators believe that this is one of the two phones known to be used by RODRIGUEZ, the 8039 phone number.  T-Mobile

---

[2] I submit that this search was justified, among other things, by the warrantless search condition of RODRIGUEZ's probation, by the automobile exception to the Fourth Amendment, and as a continued inventory search of the vehicle.

subscriber records for that phone number verify that it is associated with an iPhone; GPS tracking data shows that the last reported location of the phone was in the early morning of September 22, 2018, reflecting that the phone was off or dead at the time of the impound later that night.

      c.   The second of the phones, a black LG cellular telephone, also bearing no serial number, and bearing a circular Trac logo, was found in the trunk of the car, which as noted is where officers also seized items including the lockbox containing the suspected narcotic powder, the digital scale, and the notebooks containing apparent pay/owe drug ledgers.

    21.  On September 24, 2018, RODRIGUEZ went to the LAPD Van Nuys station to secure release paperwork for the impounded car, which required him to show identification.  Employees at the tow yard verified that RODRIGUEZ then picked up the car, and that on doing so he provided both the release paperwork and his identification.

    22.  On September 26, 2018, the Hon. Frederick F. Mumm, United States Magistrate Judge, issued search warrants for **SUBJECT PHONES 1 AND 2**, the SUBJECT VEHICLE, and the SUBJECT STORAGE UNIT.  (18-MJ-2574, -2575, and -2576).  As discussed below, investigators executed the warrants on the latter two premises on October 3, 2018, contemporaneous with the arrest of RODRIGUEZ.  However, investigators were not able to execute the search warrant for **SUBJECT PHONES 1 AND 2** within the two-week window authorized by the warrant.  Because the phones were found in close proximity to fentanyl – an extremely lethal synthetic

opioid that I understand can be absorbed through skin contact or via inhalation – the phones first needed to undergo chemical testing to ensure that they were safe to be handled by technical forensic analysts.  After they underwent such chemical testing, the phones were submitted for expedited fingerprint analysis, following which they will be ready to be transferred to technical forensic analysts.  I understand that the phones will likely be available for technical forensic analysis shortly, though just outside the two-week window for executing the prior search warrant.  Accordingly, I am seeking the instant renewed search warrant for **SUBJECT PHONES 1 AND 2**.

23.  Investigators seized **SUBJECT PHONES 3-8** during searches contemporaneous with RODRIGUEZ's arrest on October 3, 2018.  On October 2, 2018, the Hon. Steve Kim, United States Magistrate Judge, issued a search warrant for a cell-site stimulator, for use in locating RODRIGUEZ by identifying the whereabouts of the 0967 phone number.  Prior to the arrest, investigators utilized the cell-site stimulator, and the above-noted GPS tracking of RODRIGUEZ's car and phone, based on which investigators determined that RODRIGUEZ was staying at the Valley Inn located in Room 277 at 10621 Sepulveda Boulevard in Mission Hills, California ("the SUBJECT HOTEL ROOM"), and agents also conducted surveillance of RODRIGUEZ entering and leaving that room.  Investigators then secured a state court search warrant for the SUBJECT HOTEL ROOM.  After securing the search warrant, investigators saw RODRIGUEZ and R.R. leave the hotel in

21

the SUBJECT VEHICLE.  Agents pulled the car over and arrested
RODRIGUEZ.

   a.   Thereafter, investigators executed the search
warrants on the SUBJECT STORAGE UNIT, the SUBJECT VEHICLE, and
the SUBJECT HOTEL ROOM.  During search of the SUBJECT HOTEL ROOM
and SUBJECT VEHICLE, agents seized **SUBJECT PHONES 3-8** and
**SUBJECT DEVICES 1 and 2**.  Additionally, during a search of
RODRIGUEZ's person, investigators located a clear plastic bag
containing multiple clear plastic baggies containing unknown
white with gray tint powder, and a hollow pen casing with brown
residue concealed was within RODRIGUEZ's right front pocket.
During the search of R.R.'s person, investigators found a small
zip lock bag containing unknown white with grey tint powder was
located in R.R.'s right shoe slipper, and two hollowed pen
casings with unknown brown residue were located in R.R.'s front
left pant pocket.  Investigators located a cigarette package
containing foil with unknown brown residue in R.R.'s black
Adidas bag that was strapped to his person.  Lab testing of
those powders/residues is pending.

   b.   During the search of the SUBJECT VEHICLE, agents
also found, among other things, a folded tin foil with unknown
brown residue was located in the pocket of the rear passenger
door, for which lab testing is pending.

   c.   Similarly, during the search of the SUBJECT HOTEL
ROOM, agents also found a glass pipe with a round bottom
containing an unknown dark residue, which was located in a green
pouch on the television stand in room.  Investigators located a

22

folded tin foil containing an unknown white powder with grey tint located inside a small pouch of a Pokémon backpack in the room.  Additionally, investigators located numerous sheets of tin foil containing unknown burnt residue located inside trash bins along the east wall of room.  Lab testing of those substances is pending.

  d. Investigators detained B.G. after he exited the SUBJECT HOTEL ROOM prior to the execution of the search warrant for the room, investigators found folded tin foils containing an unknown white powder on his person, for which lab testing is likewise pending.

  e. RODRIGUEZ later waived his <u>Miranda</u> rights and submitted to a recorded interview.  I know from speaking with investigators who conducted the interview that RODRIGUEZ admitted to selling drugs to R.R. on the night of his death may have sold R.R. the wrong substance (<u>i.e.</u>, fentanyl instead of cocaine).  RODRIGUEZ provided the password for his cellular telephone (the 0967 phone number), which was seized from the SUBJECT HOTEL ROOM.

  f. While I understand that RODRIGUEZ gave verbal consent to search that phone, which here again may mean that the Fourth Amendment does not require a warrant to search it, I am seeking the instant warrants for that phone along with the other **SUBJECT DEVICES** in an abundance of caution.  Moreover, while the devices seized from the SUBJECT VEHICLE and SUBJECT HOTEL ROOM (<u>i.e.</u>, **SUBJECT PHONES 3-8** and **SUBJECT DEVICES 1 and 2**) likely include devices belonging to individuals other than RODRIGUEZ

23

who were also using the room, such as R.R. and B.G., I submit based on the facts herein that probable cause exists that evidence of drug trafficking and related offenses will be found on their devices as well.

### IV. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

25.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

24

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   While I currently do not know the full storage capacity of the **SUBJECT DEVICES**, I know that cellular telephones are generally capable of storing gigabytes of data.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

25

onto a hard drive, deleted, or viewed via the Internet.[3]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[3] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence

27

in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

      g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

26.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

## V.  <u>CONCLUSION</u>

27.  For all the reasons described above, there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of a controlled substance, including distribution causing death, and related conspiracy), as described above and in Attachment B of this affidavit, will be found in a search of the **SUBJECT DEVICES**.

 

 

_____

Special Agent Lindsay T. Burns
Drug Enforcement
Administration

Subscribed to and sworn before me
this _____ day of October, 2018.

 

_____

UNITED STATES MAGISTRATE JUDGE

30